IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**00C 5889**

**00C 5889**

| | | |
|---|---|---|
| GOLDMAN, SACHS & CO. | ) | |
| | ) | |
| Plaintiff, | ) | Judge: |
| | ) | JUDGE JOAN H. LEFKOW |
| v. | ) | Magistrate Judge: |
| | ) | Case No.: |
| ALGIS STRIKAS, JEFFREY BEATY | ) | MAGISTRATE JUDGE NO. |
| DEBRA ROHDE, ATUL PHULL | ) | **DOCKETED** |
| | ) | |
| Defendants. | ) | SEP 2 6 2000 |

**VERIFIED COMPLAINT
FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND OTHER RELIEF**

Plaintiff Goldman, Sachs & Co. ("Goldman Sachs"), by its attorneys, brings this

action for immediate injunctive and other relief. Goldman Sachs has initiated an arbitration to

decide the merits of this dispute. Goldman Sachs complains as follows:

**CASE OVERVIEW**

1.      This action arises out of the misappropriation of confidential business

information and other misconduct by Defendants in connection with their sudden defection to a

Goldman Sachs competitor. Prior to their simultaneous resignations without prior notice on

September 20, 2000, Defendants had worked as a team in Goldman Sachs' Chicago Private

Wealth Management group. Defendants Strikas and Beaty were Goldman Sachs Vice Presidents

who had worked for Goldman Sachs for the past 14 years and 7 years, respectively; Goldman

Sachs paid each in excess of $1 million in their last year at the firm. Defendant Rohde had been

the long-time Sales Assistant to Strikas and Beaty; defendant Phull had served as a Financial

Analyst working under Strikas and Beaty. At their termination, Defendants were servicing

approximately 142 of Goldman Sachs' high-net-worth customers or customer groups, with

account assets valued in excess of $1.5 billion. To service these client relationships, Goldman

Sachs entrusted Defendants with confidential and proprietary information relating to these

customers, as well as other confidential, privileged, and proprietary information relating to Goldman Sachs' business, products and strategies.

2.      It now has become apparent that Defendants had been conspiring for some time prior to their resignations. By the time they tendered their resignations, Defendants had already diverted both electronically and in hard copy extensive amounts of confidential and proprietary Goldman Sachs information quite clearly for use against Goldman Sachs once Defendants were gone from Goldman Sachs. In addition, before they had resigned, Defendants had solicited various of Goldman Sachs' long-time customers to encourage them to terminate their relationships with Goldman Sachs and follow Defendants. Thus, while Defendants were officers and/or employees of Goldman Sachs -- i.e., while Defendants owed Goldman Sachs fiduciary duties of loyalty and honesty -- Defendants were acting against Goldman Sachs and for their own personal interests.

3.      Among other things, Goldman Sachs has retrieved e-mails which Strikas and Rohde sent from the Goldman Sachs network to their homes before resigning. See Exs. D & E. These e-mails transmitted masses of confidential customer and business information, including sensitive business planning documents and attorney-client privileged documents. The confidential information which Defendants converted about which Goldman Sachs is currently aware also includes information relating to the customers and accounts Defendants served for Goldman Sachs *and* information regarding Goldman Sachs' current investment and strategic business and marketing initiatives. In some instances, this information was e-mailed from Goldman Sachs' office to personal e-mail addresses two-weeks' before Defendants' resignation; much of it was transmitted the day before or the day they resigned. On information and belief, Phull deleted his computer files containing similar incriminating evidence to try to cover his tracks.

4.      On information and belief, Defendants are now using the information they wrongfully appropriated before their resignations to engage in a concerted effort pursuant to their plan devised prior to their resignation to raid Goldman Sachs of customers and customer assets and to destroy the confidentiality of the Goldman Sachs information they converted from Goldman Sachs.  In soliciting Goldman Sachs' customers, Defendants also have, on information and belief, disparaged Goldman Sachs and a Goldman Sachs employee charged with trying to conserve Goldman Sachs' relationship with these customers.

5.      Defendants' conduct is already causing and threatens further irreparable harm to Goldman Sachs through the misappropriation and misuse of trade secret and other confidential information, loss of customer goodwill and customer relationships, and harm to Goldman Sachs' business reputation.

6.      Defendants' conduct against Goldman Sachs, which is described in more detail below, constitutes unfair competition, breach of fiduciary duty, misappropriation of trade secrets and conversion.  Defendants' conduct also violates Goldman Sachs' confidentiality policies to which Defendants agreed as a condition of and throughout their employment by Goldman Sachs.

7.      The day they resigned, Defendants began working for Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrll Lynch") (a Goldman Sachs competitor) in offices one floor beneath Goldman Sachs' Chicago office.  On information and belief, Merrill Lynch paid or promised Defendants a substantial signing bonus, probably in excess of $10 million, on the assumption that Defendants would move a large block of Goldman Sachs' business with them -- i.e., the motive for Defendants' misconduct.

8.      By this action, Goldman Sachs does not seek to restrain Defendants from working for a Goldman Sachs competitor.  Rather, Goldman Sachs seeks immediate injunctive relief to prevent Defendants from using and profiting from the information they unlawfully

misappropriated and from other breaches of duties owed to Goldman Sachs pending the outcome of an arbitration initiated by Goldman Sachs simultaneously with the filing of this complaint.

## PARTIES

9. Goldman Sachs is a full service investment banking and securities firm. Among other services, Goldman Sachs offers brokerage and asset management services to high-net-worth customers through its Private Wealth Management group. Goldman Sachs is a New York limited partnership with its principal place of business in New York City. Goldman Sachs maintains offices in various other locations, including Chicago, where Defendants were based.

10. Algis Strikas currently resides in LaGrange, Illinois.

11. Jeffrey Beaty currently resides in Chicago, Illinois.

12. Deborah Rohde currently resides in Oak Lawn, Illinois.

13. Atul Phull currently resides in Chicago, Illinois.

## JURISDICTION AND VENUE

14. This District Court has personal jurisdiction over Defendants because they reside and do business in this District.

15. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between the parties and the amount in controversy exceeds $75,000, including, without limitation, the value to Goldman Sachs of the injunctive relief requested herein.

16. Venue also is proper in this District because Defendants reside in the District and the events giving rise to the claims at issue in this Verified Complaint occurred here. See 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.    Defendants received access to Goldman Sachs' confidential information
pursuant to their fiduciary relationships with Goldman Sachs.**

17.    Goldman Sachs' Private Wealth Management group primarily services the
investment needs of high-net-worth individuals, families, and foundations.  Goldman Sachs
cultivates and maintains these relationships over time based on the quality of its products and
services.

18.    Goldman Sachs generates and maintains substantial amounts of
confidential information relating to its customers.  Goldman Sachs' customers demand and
expect confidentiality for the information Goldman Sachs generates about them.

19.    Goldman Sachs also generates substantial amounts of confidential
information relating to its business.  Goldman Sachs develops proprietary investments and
strategies especially for its customers.  The information relating to these investments and
strategies is proprietary and is maintained as confidential by Goldman Sachs.  Goldman Sachs
also develops information relating to its own business initiatives and strategies.  This information
also is proprietary and maintained as confidential by Goldman Sachs.

20.    Goldman Sachs' customer and business information represents a
significant business asset to Goldman Sachs which by virtue of being confidential to Goldman
Sachs provides Goldman Sachs a competitive advantage.

21.    To protect the confidentiality of this information, Goldman Sachs has
instituted numerous policies and precautions.  Goldman Sachs has security at all of its offices
and restricts access to confidential information on a need-to-know basis.  Goldman Sachs also
has other security provisions, including computer passcodes and detailed security procedures.

22.    To protect the confidentiality of its customer and business information,
Goldman Sachs has confidentiality policies to which each of the Defendants has agreed.  For

example, the Goldman Sachs Employee Handbook defines confidential information to include "nonpublic information and materials relating to the business and financial affairs of [Goldman Sachs], . . . and its clients . . . (including client lists and account information . . . )." This policy specifies that "[c]onfidential information may be used only as [Goldman Sachs] has authorized; . . . [employees] are prohibited from sharing confidential information with any person . . . who does not have a need to know or see it." The Handbook further specifies that employees must "hold all proprietary information and materials in strict confidence" and that employees "may not give, disclose, copy, reproduce, license, market, or transfer such information and materials to any entity or person . . .." Upon termination, the Handbook requires that employees must "return to the firm all materials in [their] possession or control that relate to the firm, or that contain or were derived from confidential information"; and that "[i]f asked, [the employee] must provide a signed certificate verifying that this had been done." True and correct copies of relevant pages of the Employee Handbook, together with Strikas' and Beaty's acknowledgment of receipt and compliance with the Employee Handbook, are attached hereto as Exhibit A.

23. All Defendants expressly agreed to comply with Goldman Sachs' "Policies and Procedures Regarding Confidential and Proprietary Information, the Chinese Wall and Personal Trading" (the "Policies and Procedures"). The Policies and Procedures provides definitions of confidential and proprietary information (at pp. 7-8) and procedures for handling such information (at pp. 11-15). The policies and Procedures further specify that:

> Proprietary information may be used only for the business purposes for which the information was created or obtained; any other use without the express prior approval of the appropriate division head is a misuse.

> Confidential or proprietary information may not be used by a partner or employee for that person's personal benefit or for the benefit of any related person.

> No one may communicate confidential or proprietary information to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in the misuse of the information.

Policies and Procedures at 9. True and correct copies of these Goldman Sachs Policies and Procedures, together with Defendants' acknowledgment of receipt and compliance with the Policies and Procedures as signed by all Defendants, are attached hereto as Exhibit B.

24.     Other confidentiality agreements containing similar terms to which the Defendants entered into with Goldman Sachs at the outset of and at other times during their employment by Goldman Sachs are Ex. C.

25.     In reliance on their promises to maintain the confidentiality of its customer and business information, Defendants were furnished with and granted access to substantial amounts of Goldman Sachs customer and business information. Access to Goldman Sachs' confidential information afforded Defendants significant benefits, including permitting Defendants to develop relationships with many of Goldman Sachs' long-time customers and earn substantial and increasing incomes from Goldman Sachs.

26.     Defendants received other benefits of employment through Goldman Sachs. Goldman Sachs provided Defendants with training and other support at Goldman Sachs' expense. Strikas and Beaty were hired by Goldman Sachs directly from school and trained in Goldman Sachs' program. Phull was also hired directly from school and was in process of being trained. Goldman Sachs assisted Defendants in developing and expanding the customer-base with which they worked by providing them with new Goldman Sachs customer accounts and leads, customer referrals, and reassignments of Goldman Sachs customers' accounts. Goldman Sachs' good name and reputation are invaluable in developing a customer base. Goldman Sachs provided Defendants with ongoing sales, research, marketing, and supervisory support and permitted Defendants to sell (to the extent authorized) Goldman Sachs investment products.

27.     At the time of Defendants' mass resignation, they were servicing approximately 142 Goldman Sachs customers or customer groups for the Company, representing

accounts with assets in excess of $1.5 billion. Collectively, they received more than $3 million in compensation in 1999 from Goldman Sachs.

**B.      Defendants breached their duties to Goldman Sachs, including by conspiring against it and misappropriating its confidential information.**

       28.      While still serving as officers and/or employees of Goldman Sachs and in positions of trust and confidence at Goldman Sachs, Defendants conspired against Goldman Sachs.

       29.      On information and belief, Defendants planned and coordinated their conspiracy against Goldman Sachs at Goldman Sachs' offices and during normal business hours.

       30.      Pursuant to this conspiracy, Defendants agreed to resign simultaneously from Goldman Sachs. (Defendants' resignation letters are effectively identical.) On information and belief, Strikas and/or Beaty, while officers of Goldman Sachs, solicited Rohde and Phull to leave Goldman Sachs. On information and belief, Defendants simultaneously resigned without notice (Goldman Sachs' employment policies require two-weeks advance notice) to attempt to disadvantage Goldman Sachs to the greatest extent possible. Defendants were the primary means through which Goldman Sachs interacted with the Goldman Sachs customers Defendants serviced. By leaving all at once and without prior notice, Defendants, on information and belief, intended to disrupt Goldman Sachs' customer relationships in the expectation that Defendants could then capitalize on this disruption to divert the customers from Goldman Sachs.

       31.      Defendants have converted Goldman Sachs' confidential, customer and business information. This information is Goldman Sachs' property and contains Goldman Sachs proprietary and trade secret information and confidential customer information. This confidential customer information is entrusted to Goldman Sachs by its customers; Goldman Sachs has promised to protect this information; Defendants expressly promised to guard the confidentiality of this information.

32.     While Defendants were entitled to use this information to perform their duties to Goldman Sachs, they had no authorization or right to copy all or part of such records for personal use and were specifically required by Goldman Sachs' Employee Manual to return such records and copies thereof to Goldman Sachs upon terminating from Goldman Sachs.

33.     Goldman Sachs has uncovered extremely powerful evidence of Strikas' and Rohde's misappropriation and conversion of Goldman Sachs customer and business information.  On September 8, 2000, and again on September 19, 2000 (the day before Defendants resigned), Rohde e-mailed substantial volumes of customer information to an e-mail account in the name of C. Rohde at AOL.  Ms. Rohde's husband's name is Carl Rohde.  Rohde sent information on all accounts serviced by Defendants' team, ranked by revenue generated, showing account name, number, class, whether there is a trust, name of trustee, tax payer ID, and address.  On September 19, 2000, Rohde also sent to this same e-mail account other detailed and sensitive customer information.  Rohde did not have Goldman Sachs' authorization to send any of this information out of Goldman Sachs.  This material is not publically available and cannot be reconstructed from other sources.  Copies of examples of Rohde's e-mails (with confidential material redacted) are Ex. D.

34.     While employed as an officer of Goldman Sachs, Strikas sent extensive amounts of confidential Goldman Sachs information to an e-mail account in his name at AOL. Among information sent in this manner by Strikas on September 15, 2000 (the Friday before he resigned) is confidential and proprietary (and in some instances attorney-client privileged) analysis of issues relating to Goldman Sachs' efforts and strategies with respect to Canadian customers and customer prospects.  (Defendants team was assigned to offer Goldman Sachs' Private Wealth Management group products and services to the Canadian market).  Included in these unauthorized transmissions was information for all accounts Defendants were servicing in Canada, showing account name, number and providing detailed asset allocation information.

Strikas also e-mailed to himself proprietary Goldman Sachs analysis of approximately 100 wealthy Canadians who Goldman Sachs might approach. Strikas also transmitted to himself a proprietary Goldman Sachs internal presentation regarding "Canadian Wealth Management." This multi-part presentation, which includes attorney-client privileged communications (so marked) discloses Goldman Sachs' strategic business plan for the Canadian market. Strikas did not have Goldman Sachs' authorization to send any of this information out of Goldman Sachs. This material is not publically available and cannot be reconstructed from other sources. Copies of examples of Strikas' e-mails (with confidential material redacted) are Ex. E.

35.     Phull's computer files at Goldman Sachs containing correspondence and communications (similar to those files searched for Strikas and Rohde to find the previously mentioned e-mails) have been deleted. On information and belief, Phull deleted these files intentionally in an effort to cover up additional misconduct and misuse of Goldman Sachs confidential information.

36.     Upon Defendants' resignation, Goldman Sachs has discovered that various key, hard-copy files normally maintained by Defendants are missing. (Defendants' desk drawers at Goldman Sachs' Chicago office were generally found to be empty.) Included among the missing files are highly sensitive records relating to Goldman Sachs' investments which it offers to its high-net-worth customers. These records contain proprietary information relating to these transactions. Not only are most of these transactions themselves confidential, but the transaction and deal structures, terms and other specifics are confidential as well. Strikas' Rolodex was also not found at the Goldman Sachs office where it was kept. On information and belief, Defendants took these records from Goldman Sachs' office in the period leading up to their resignations on September 20, 2000.

37.     Prior to September 20, 2000, Rohde was also seen printing out large stacks of customer account statements. (Such statements facilitate the transfer of certain accounts from

Goldman Sachs.) These account statements are no longer in Goldman Sachs' office and, on information and belief, were removed from Goldman Sachs' office by Defendants sometime before September 20, 2000.

38. Goldman Sachs has demanded the return of this information, but Defendants have not complied.

39. Prior to resigning, and thus while owing Goldman Sachs fiduciary duties of loyalty and honesty, Defendants solicited Goldman Sachs customers to leave Goldman Sachs and follow Defendants to their new employment (including the day before Defendants resigned).

40. Defendants are currently aggressively soliciting Goldman Sachs customers to leave Goldman Sachs. On information and belief, Defendants are using the information they took from Goldman Sachs' office to solicit and divert Goldman Sachs customers from Goldman Sachs. In soliciting Goldman Sachs' customers, Defendants also have, on information and belief, disparaged Goldman Sachs and a Goldman Sachs employee charged with trying to conserve Goldman Sachs' relationship with these customers.

**C.** **Defendants threaten to inflict serious and irreparable injury on Goldman Sachs.**

41. On information and belief, Defendants continue to have possession or control of Goldman Sachs proprietary and trade secret information, including detailed, confidential lists of Goldman Sachs' customers and customer information and Goldman Sachs proprietary business analysis.

42. On information and belief, Defendants have used and will continue to use the Goldman Sachs proprietary and trade secret information in their possession or control to solicit the Company's customers, to divert these customers' business from Goldman Sachs to Defendants' new venture, and otherwise to engage in acts constituting conversion and misappropriation of the Company's trade secrets and confidential information, breach of fiduciary duties, and other tortious conduct.

43.     Defendants' conduct has already sabotaged Goldman Sachs' relations with customers and, if not stopped, threatens continued harm to these relationships.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS

44.     Goldman Sachs incorporates the above allegations.

45.     Goldman Sachs has protectable trade secrets in its customer and business information.

46.     Goldman Sachs derives economic value from these trade secrets due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

47.     Goldman Sachs has made reasonable efforts under the circumstances to maintain its trade secrets' secrecy and confidentiality.

48.     Defendants have misappropriated Goldman Sachs' trade secrets and, on information and belief, are using these secrets against Goldman Sachs.

49.     Goldman Sachs has been injured and is continuing to be injured by Defendants' misappropriation of its trade secrets.

## COUNT II

## CONVERSION

50.     Goldman Sachs incorporates the above allegations.

51.     Defendants have wrongfully, and without authorization, retained possession, custody or control over files and information belonging to Goldman Sachs.

52.     Goldman Sachs is the rightful owner of all copies of Goldman Sachs' customer records and information and Goldman Sachs' business information taken by Defendants.

53.     Goldman Sachs' rights to possession of this property is immediate, absolute, and unconditional.

54.     Goldman Sachs has been injured and is continuing to be injured by Defendants' misappropriation.

## COUNT III

## BREACH OF FIDUCIARY DUTY

55.     Goldman Sachs incorporates the above allegations.

56.     As employees and officers of Goldman Sachs who were allowed access to Goldman Sachs' confidential and other information, Defendants owe Goldman Sachs certain fiduciary duties.

57.     Among these fiduciary duties are the duty of loyalty and fair dealing while working for Goldman Sachs, the duty to advance the interests of Goldman Sachs, the duty to preserve Goldman Sachs' information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Goldman Sachs' interests.

58.     Defendants breached these duties by, among other things, preparing to leave and leaving simultaneously; converting Goldman Sachs' confidential and trade secret information to their personal use while affiliated with Goldman Sachs, and afterwards; using this information against Goldman Sachs' interests; and, while employed by Goldman Sachs, soliciting and diverting customers from Goldman Sachs.

59.     Goldman Sachs has been injured and is continuing to be injured by Defendants' breaches.

## COUNT IV

## ENFORCEMENT OF CONFIDENTIALITY POLICIES/
## BREACH OF CONTRACT

60.     Goldman Sachs incorporates the above allegations.

61.     Defendants agreed to comply with Goldman Sachs' confidentiality policies, including those in the Employee Handbook.

62.     This Handbook provides that Defendants agree to "hold all proprietary information and materials in strict confidence"; that employees "may not give, disclose, copy, reproduce, license, market, or transfer such information and materials to any entity or person . . ."; that a terminating employee must "return to the firm all materials in [his or her] possession or control that relate to the firm, or that contain or were derived from confidential information"; and that "[i]f asked, you must provide a signed certificate verifying that this had been done." The Employee Handbook specifically defines confidential information as including customer lists and account information and "nonpublic information and materials relating to the business and financial affairs of the firm. . . ."

63.     These terms are reasonable in that they impose restraints on Defendants that are no greater than required to protect Goldman Sachs' legitimate interests, do not impose undue burden on Defendants, and are not injurious to the public.

64.     These terms protect Goldman Sachs' legitimate interests in its trade secret and other confidential information and in its goodwill. These terms also protect Goldman Sachs' customers' privacy which Defendants and Goldman Sachs have promised to preserve.

65.     Defendants have willfully breached the terms of their confidentiality agreements by, among other things, converting to their personal benefit confidential Goldman Sachs records.

66.     Goldman Sachs has been injured and is continuing to be injured by Defendants' breaches.

## COUNT V

### INTENTIONAL INTERFERENCE WITH
### BUSINESS RELATIONSHIPS

67.     Goldman Sachs incorporates the above allegations.

68.     Goldman Sachs reasonably expects to enter into valid future business relationships with its employees and its existing and prospective customers.

69.     On information and belief, Defendants are aware of Goldman Sachs' expectancy to continue and to enter into valid business relationships with these customers and personnel.

70.     Defendants have interfered, and on information and belief, are continuing purposefully to interfere with these existing and prospective business relationships.

71.     Defendants interference has prevented or will prevent Goldman Sachs' legitimate expectancies from continuing as and/or ripening into valid business relationships.

72.     On information and belief, Defendants are intentionally interfering with these existing and prospective business relationships, and, by doing so, intend to injure financially Goldman Sachs.

73.     Goldman Sachs has been injured and is continuing to be injured as a result of Defendants' tortious interference with its business relationships.

**WHEREFORE**, Goldman Sachs respectfully requests the following relief:

A.     Direct Defendants to return all originals and copies of information, documents and other things taken from Goldman Sachs, including all Goldman Sachs customer records, customer lists, and business information in Defendants' possession or control, in hard copy or electronically stored (all electronically stored records must also be deleted permanently from Defendants' computers or other electronic memory files);

B.     Enjoin Defendants, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms and corporations acting in connection or participation with them or on their behalf, from revealing, disclosing or using in any manner information contained in the records of Goldman Sachs, including the names, addresses, or any financial

-15-

information of any Goldman Sachs customer or prospective customer whom Defendants served or whose name became known to Defendants while they represented Goldman Sachs;

C.  Direct Defendants to provide Goldman Sachs with an accounting of all fees and commissions received by them, directly or indirectly, after their resignation from Goldman Sachs, from any Goldman Sachs customer whom they served or whose name became known to them while they represented Goldman Sachs;

D.  Direct Defendants to segregate all receipts from, and to maintain separate accounts for, all services performed for and products sold to any person who is or was a Goldman Sachs customer Defendants served or whose name became known to them while they represented Goldman Sachs to hold such receipts in trust for the benefit of Goldman Sachs;

E.  Impose a constructive trust for Goldman Sachs's benefit on all proceeds of Defendants' fiduciary breaches; and

F.  Grant such other relief as just and appropriate.

September 25, 2000

Respectfully submitted,

By: _____

Gary M. Elden
Eric D. Brandfonbrener
GRIPPO & ELDEN
227 West Monroe Street, Suite 3600
Chicago, Illinois 60606
Telephone No.: (312) 704-7700
Facsimile No.: (312) 558-1195

*Attorneys for Plaintiff Goldman, Sachs & Co.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GOLDMAN, SACHS & CO.        )
                            )
            Plaintiff,      )        Judge:
                            )
        v.                  )        Magistrate Judge:
                            )
ALGIS STRIKAS, JEFFREY BEATY )       Case No.:
DEBRA ROHDE, ATUL PHULL     )
                            )
            Defendants.     )

### VERIFICATION BY CERTIFICATION

I, Bruce A. Heyman, being first duly sworn on oath, depose and state as follows:

1.      I am a Managing Director of plaintiff Goldman, Sachs & Co. and am familiar
with the facts set forth herein.

2.      I certify that the factual statements set forth in the Verified Complaint For
Temporary Restraining Order, Preliminary Injunction,                    And Other
Relief are true and correct, except as to matters therein stated to be on information and belief, and as to
such matters I certify that I verily believe the same to be true.

FURTHER AFFIANT SAYETH NOT.

_____
Bruce A. Heyman

SUBSCRIBED and SWORN to
before me this _25_ th day of
September, 2000.

_____
Notary Public

"OFFICIAL SEAL"
D LYNNE A. SCHADE
NOTARY PUBLIC
STATE OF ILLINOIS
COMMISSION EXPIRES 12/14/03

EXHIBIT  A



RECEIVED

E

To:     Algis Strikas [ID#87730]
        Private Client Services
        Chicago

From:   Bruce M. Larson

Date:   November, 1999

Re:     U.S. Employee Handbook: Policies, Procedures
        and Benefits

---

We are pleased to provide an updated copy of the U.S. Employee Handbook, which outlines the firm's personnel policies, procedures and benefits. This edition of the handbook supercedes all previous editions.

It is very important that you read the handbook, especially since many sections are new or revised. The handbook provides important information about your entitlements and obligations as an employee. Please sign below to indicate that you have received the handbook and will comply with all handbook policies and procedures therein, as amended from time to time.

If you have any questions concerning the handbook, please direct them to Human Resources in New York at 357-8228.

Signature of Algis Strikas

Date



RECEIVED

To: Jeffrey Beaty [ID#09803]
Private Client Services
Chicago

E

From: Bruce M. Larson

Date: November, 1999

Re: U.S. Employee Handbook: Policies, Procedures and Benefits

---

We are pleased to provide an updated copy of the U.S. Employee Handbook, which outlines the firm's personnel policies, procedures and benefits. This edition of the handbook supercedes all previous editions.

It is very important that you read the handbook, especially since many sections are new or revised. The handbook provides important information about your entitlements and obligations as an employee. Please sign below to indicate that you have received the handbook and will comply with all handbook policies and procedures therein, as amended from time to time.

If you have any questions concerning the handbook, please direct them to Human Resources in New York at 357-8228.

Signature of Jeffrey Beaty

11/18/99

Date

# EMPLOYEE
# HANDBOOK
# U.S.

**Goldman
Sachs**

ployees who are absent from work due to personal illness or illness of a family member may, at the firm's discretion, be required to submit medical certification regarding the illness.

## CONDUCT AND APPEARANCE

Your conduct and appearance contribute substantially to the image of the firm. For this reason, the firm expects you to be polite and considerate to your co-workers and outside contacts. You are also expected to be well-groomed and reasonably conservative in manner and dress.

## CONFIDENTIALITY OF FIRM INFORMATION

In the course of your employment you may have access to confidential information, which includes nonpublic information and materials relating to the business and financial affairs of the firm, its employees, and its clients or other third parties (including client lists and account information, personnel matters, operating procedures, organizational responsibilities, marketing matters and policies or procedures), as well as the personal affairs of employees. Confidential information may be used only as the firm has authorized; except for those authorized purposes, you are prohibited from sharing confidential information with any person (including another employee of the firm) who does not have a need to know or see it.

It is also important to remember that as a public company we must be vigilant in protecting any information about our business, our financial condition or our results that is not already public. This includes, for example, confirming or denying any rumors regarding the firm, whether in a public or a private setting, including those published in a newspaper or other medium. In addition, many of us have access to information that may not appear on its face to be "material"—for example, how a trading desk is performing, the possible departure of a key employee or the overall level of activity in any area. Depending on circumstances, information of this type may be viewed as material by the market or regulatory authorities, and should be discussed only with individuals within the firm where there is an appropriate business need for them to know the information. No material, nonpublic information may be disclosed to any third

parties without advance approval by your manager, the Legal Department or Central Compliance.

At the conclusion of your employment, or earlier if requested, you must return to the firm all materials in your possession or control that relate to the firm, or that contain or were derived from confidential information. If asked, you must provide a signed certificate verifying that this has been done.

Unless you have prior written authorization from the firm, you are not permitted to publicize or disclose any information about the firm, its present or former personnel or clients, or any aspects of your employment with the firm or the termination of your employment, to any reporter, author, producer or similar person or entity, or take any other action likely to result in such information being made available to the general public.

While employed at the firm, you also may not use or allow disclosure within Goldman Sachs of any information that is confidential or proprietary to a third party (including a former employer), nor may you use information in any manner that would constitute a violation of any undertaking or agreement with a third party.

The firm's policies and procedures concerning confidentiality of firm and client information are discussed further in various documents, including the agreement concerning confidential and proprietary information and materials that you were asked to sign upon joining the firm, and in the booklet entitled *Policies and Procedures Regarding Confidential and Proprietary Information, the Chinese Wall and Personal Trading.* You are responsible for familiarizing yourself with the contents of that booklet. In your handling of information and materials, you also must comply with the policies applicable to proprietary information (see Section E—Protection of Proprietary Information).

## CONTACT WITH THE MEDIA

Only those managing directors, vice presidents or department managers who have been specifically authorized may communicate with the press or other media representatives concerning the firm, its activities, its personnel or its clients.

*ing.* The Compliance Department will coordinate the approval process.

## PROTECTION OF PROPRIETARY INFORMATION

The ideas and materials conceived by you while you are an employee of the firm are considered works-for-hire and are the exclusive property of the firm. Such ideas and materials ("proprietary information and materials") may not be used for any purpose other than for the benefit of the firm, and unless you obtain the firm's consent, you may not retain any copies when your employment with the firm terminates.

You have an obligation to hold all proprietary information and materials in strict confidence; you may not give, disclose, copy, reproduce, sell, assign, license, market or transfer such information and materials to any entity or person, including any employee of the firm, who does not have a need to know or see it.

The firm's policies and procedures concerning protection of proprietary information and materials are discussed further in various documents, including the agreement concerning confidential and proprietary information and materials that you were asked to sign upon joining the firm, and the booklet entitled *Policies and Procedures Regarding Confidential and Proprietary Information, the Chinese Wall and Personal Trading.* In your handling of information and materials, you also must comply with the policies applicable to confidential information (see Section E—Confidentiality of Firm Information).

## PUBLICATIONS, SPEECHES AND USE OF THE FIRM NAME

No employee may publish any written work or work in any other medium, deliver any public speech or grant any public interview that relates to the firm, its business, its personnel or its clients without obtaining the approval of the head of his/her department, which will be granted only after consultation with the Legal Department.

Employees are cautioned that they may not use or authorize the use of the firm's name in connection with any non-firm matter without obtaining prior written approval from the

# EXHIBIT  B

# Individual Acknowledgment

**This acknowledgment must be signed and returned to Jeanne A. Yoa, 85/3 in the Personnel Department within 10 days.**

I have received a copy of the *Goldman, Sachs & Co. Policies and Procedures Regarding Confidential or Proprietary Information, the Chinese Wall and Personal Trading,* dated October 1992. I have read and I agree to comply with these policies and procedures. I understand and agree that a failure to observe such policies and procedures may subject me to disciplinary action.

▐ Signature: _____    ▐ Date: 1-29-93

▐ Print Name: Algis Strikas    ▐ Payroll No.: 877308

▐ Department: _____    ▐ Work Ext.: x5250

**For Personnel Department use only:**

▐ Data Entered: _____    ▐ Date Rec.: _____

▐ Sent to Compliance for Review: _____    ▐ Date Sent: _____

*Fold and tear along dotted line to remove this form.*

# Individual Acknowledgment

*ID#?*

**This acknowledgment must be signed and returned to Jeanne A. Yoa, 85/3 in the Personnel Department within 10 days.**

I have received a copy of the *Goldman, Sachs & Co. Policies and Procedures Regarding Confidential or Proprietary Information, the Chinese Wall and Personal Trading,* dated October 1992. I have read and I agree to comply with these policies and procedures. I understand and agree that a failure to observe such policies and procedures may subject me to disciplinary action.

▌ Signature: *Beaty*                                      ▌ Date: *July 2/93*

▌ Print Name: *Jeffrey Beaty*          ▌ Payroll No.: *098038*

▌ Department: *PCS/Chicago*          ▌ Work Ext.: *5006*

**For Personnel Department use only:**

▌ Data Entered: _____          ▌ Date Rec.: _____

▌ Sent to Compliance for Review: _____          ▌ Date Sent: _____

# Individual Acknowledgment

**This acknowledgment must be signed and returned to Jeanne A. Yoa, 85/3 in the Personnel Department within 10 days.**

I have received a copy of the *Goldman, Sachs & Co. Policies and Procedures Regarding Confidential or Proprietary Information, the Chinese Wall and Personal Trading*, dated October 1992. I have read and I agree to comply with these policies and procedures. I understand and agree that a failure to observe such policies and procedures may subject me to disciplinary action.

▪ Signature: *Debra L Marczyk*          ▪ Date: 1/28/93

▪ Print Name: *Debra L. Marczyk*          ▪ Payroll No.: *125344*

▪ Department: *B20*          ▪ Work Ext.: *5096*

**For Personnel Department use only:**

▪ Data Entered:          ▪ Date Rec.:

▪ Sent to Compliance for Review:          ▪ Date Sent:

*Fold and tear along dotted line to remove this form.*

# INDIVIDUAL ACKNOWLEDGMENT

I have received a copy of the Goldman, Sachs & Co. *"Policies and Procedures Regarding Confidential or Proprietary Information, the Chinese Wall and Personal Trading"*. I have read and I agree to comply with these policies and procedures. I understand and agree that a failure to observe such policies and procedures may subject me to disciplinary action.

_____          _____
            **Signature**                                    7/13/98
                                                         **Date**

_____          _____
        A TUL  PHULL                              **Payroll No.**
          **Print Name**

_____          _____
      EQUITIES - PCS                         voice mail - x 3300
      **Department/Division**                      **Work Ext.**

INAC 1/98

# Goldman, Sachs & Co.

and its affiliates

## Policies and Procedures Regarding Confidential or Proprietary Information, the Chinese Wall and Personal Trading



# Table of Contents

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A The Purpose of This Memorandum. . . . . . . . . . . . . . . . . . . . . . . . . . . 3
B. Implementation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
C. Questions and Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
D. Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       1. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       2. Chinese Wall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       3. Wall-Crossing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       4. Personal Trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       5. Private Investments and Outside Business Activities. . . . . . . . . . 6

II. Policies Regarding Confidential and Proprietary Information. . . . . . . 7

A. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       1. Confidential Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       2. Proprietary Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       3. Material Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       4. Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       5. Futures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
B. Prohibition on the Misuse of Material Confidential or
    Proprietary Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
       1. Use of Material Confidential or Proprietary Information . . . . . . . 9
       2. Trading While in Possession of or With Knowledge of
          Material Confidential Information. . . . . . . . . . . . . . . . . . . . . 9
       3. Trading While in Possession of or With Knowledge of
          Material Proprietary Information. . . . . . . . . . . . . . . . . . . . . 9
       4. Trading in Securities on the Restricted Trading List,
          Rumor and Deal List, and Research Restricted List . . . . . . . . . 10
       5. Recommendations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
       6. Treatment of Customer Orders . . . . . . . . . . . . . . . . . . . . . . . . . 10

III. Procedures for Handling Confidential and Proprietary Information 11

A. Introduction (Chinese Wall Policies) . . . . . . . . . . . . . . . . . . . . . . . . . . 11
B. General Procedures for Safeguarding
    Confidential and Proprietary Information . . . . . . . . . . . . . . . . . . . . . . 11
C. Restrictions on the Flow of Confidential Information . . . . . . . . . . . . . . 13
D. Wall-Crossing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1

**IV. The Grey List** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
B. Placement of Securities on and off the Grey List. . . . . . . . . . . . . . . . . . . . . 16
C. Monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**V. The Restricted Trading List** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
B. Use of the Restricted Trading List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
C. Prohibitions Relating to Restricted Trading List Securities . . . . . . . . . . . 18
D. Placement of Securities on and off the Restricted Trading List. . . . . . . . 18
E. Exceptions to the Restricted Trading List . . . . . . . . . . . . . . . . . . . . . . . . . . 19
F. Monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**VI. Research Restricted List** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**VII. Rumor and Deal List** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**VIII. Partner, Employee and Related Accounts and Trading** . . . . . . . . . . 22

A. General Policies (purpose and scope) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
B. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      1. Partner or Employee Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      2. Related Account. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
C. Monitoring Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
D. Specific Trading Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
E. Specific Division or Business Unit Limitations . . . . . . . . . . . . . . . . . . . . . 24
F. Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**IX. Private Investments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**X. Outside Business Activities**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

10/95

# I. Introduction

**A. The Purpose of This Memorandum**

This Memorandum consolidates the laws, policies and procedures that guide partners and employees in certain aspects of their work at Goldman, Sachs & Co. and its affiliates (the "Firm").

As noted in our Business Principles, in the course of their everyday work, partners and employees frequently learn information of a confidential nature pertaining to the business of the Firm or its clients. To break a confidence or to use confidential information improperly or carelessly would be unthinkable.

Breaching a confidence or misusing confidential or proprietary information improperly would also violate the Firm's policies. In addition, it could violate federal and state securities laws, federal commodities laws, and other legal and regulatory requirements including, in some circumstances, those of jurisdictions other than the United States. A violation carries serious penalties for the Firm and its employees. A violation of federal or state securities laws can carry criminal and civil penalties not only for the person who violates the law, but also for persons who control the violator and persons who "tip" or otherwise aid the violator.

Even being accused of violations might damage one of our key assets, our reputation. Since integrity and honesty are at the heart of our business, the harm would be difficult to repair.

Our best approach, therefore, is to prevent legal and ethical violations by properly handling confidential or proprietary information. In this way, we can avoid situations in which information appears to have been misused.

This Memorandum is designed to help you achieve these goals. It applies to all partners and employees, including part-time employees. Unless otherwise specified, it also applies to all limited partners and unless otherwise specified it also applies to all limited partners and consultants and temporaries ("non-employee workers"). The Memorandum is supplemented by Bulletins that are to be followed within certain business units.

Even if you no longer work for Goldman Sachs, you must maintain the secrecy of proprietary and confidential information learned during your employment or affiliation. Upon leaving the Firm, you may be required to sign an acknowledgement of this continuing obligation and to certify that all confidential materials have been returned to the Firm.

Goldman Sachs takes very seriously its responsibility to maintain the confidentiality of all Firm and client information and to comply fully with all laws and regulations. The Firm carefully monitors compliance with these

3

policies and procedures and will take action against violators, including termination of employment. In certain cases, Goldman Sachs may also report violations of these policies and procedures to the U.S. Securities and Exchange Commission or other appropriate authorities.

**B. Implementation**

Division heads, business unit heads as identified in the Supervision Manual (such as Fixed Income Business Unit Heads, Equities N.Y. Sales Managers, Trading and Arbitrage Desk Supervisors, IBD Supervisors, PIA Supervisors, and J. Aron Supervisors), designated supervisory persons, the Legal and Compliance Departments, and division compliance personnel are responsible for implementing, maintaining and enforcing these policies and procedures in their respective divisions and business units. The Firm's Supervision Manual and the Bulletins identify persons with particular responsibility for the operation of these procedures. The Legal and Compliance Departments also work with the management of each division to coordinate education and training.

**C. Questions and Exceptions**

If you have any questions about the application of these policies or procedures, you should promptly consult the supervisory person designated in the appropriate Bulletin, the Legal Department or the Compliance Department.

Requests for exceptions to these policies should be referred to the Legal Department or the Compliance Department, unless otherwise specified.

**D. Summary**

This section summarizes the Firm's policies and procedures regarding confidential or proprietary information, the Chinese Wall and personal trading. You are expected to become familiar with the contents of the entire Memorandum and with the Bulletins that apply to your business unit.

**1. Confidentiality**

As a partner or employee of the Firm, you may have access to nonpublic information regarded as confidential (provided by an external source such as a client) or proprietary (created by the Firm). Confidential or proprietary information must not be used for your personal benefit or shared with others for their personal gain. Unauthorized or improper use of such information could result in liability for, and severe penalties against, you and the Firm.

▌ To ensure that the Firm's policies regarding confidentiality are implemented, you should:

▌ **not** buy, sell or recommend a security while you have knowledge of or are in possession of material confidential information regarding the security or its issuer (information is material if it is likely to be viewed by a reasonable investor as important in deciding whether to buy, sell or hold those securities);

▌ **not** buy, sell or recommend a security while you have knowledge of or are in possession of material proprietary information regarding the security or its issuer, unless the transaction is consistent with the Firm's business purposes for which the information was created or obtained;

4

- **not** disclose confidential or proprietary information, except to persons who have a "need to know" the information in order to serve the business purposes of the Firm or our clients;

- treat as confidential all nonpublic information provided directly or indirectly by a client, prospective client or third party with the expectation that the information will be kept confidential;

- use confidential or proprietary information only for the specific business purposes for which the information was given, created or obtained;

- avoid discussions of sensitive information in the presence of others who do not have a need to know such information, and should exercise extreme caution when discussing sensitive information in hallways, elevators, trains, subways, airplanes, restaurants, social gatherings or other public places;

- keep clients' identities confidential and use code names or numbers for sensitive projects;

- exercise care to avoid placing documents containing sensitive information in areas where they may be read by unauthorized persons, and to store such documents in secure locations when they are not in use;

- avoid using speakerphones in circumstances where confidential information may be overheard, and be aware that mobile telephones as well as communications over the Internet must be used with great care because their transmissions may be picked up by others.

- excercise care when sending sensitive information to voice and electronic mail distribution lists.

## 2. Chinese Wall

To control the flow of confidential and proprietary information, the Firm has created a "Chinese Wall" to separate those persons engaged in research, sales, trading or other nonadvisory activities (the "sales and trading side of the Firm") from persons engaged in investment banking or other advisory activities (the "advisory side of the Firm"). The Chinese Wall is also meant to prevent persons on the sales and trading side of the Firm from gaining access to confidential information acquired or developed by the advisory side of Firm. The sales and trading side of the Firm includes all personnel in Investment Research and those persons in the Equities and Fixed Income Divisions and J. Aron who are engaged in research, trading (including arbitrage), sales or other nonadvisory activities. The advisory side of the Firm includes all personnel in IBD, the Credit Department, the Principal Investment Area, Real Estate PIA, and those persons or functions in the Equities and Fixed Income Divisions (e.g. Equities Capital Markets, Asset Backed Finance, Bank Loan Origination, Bridge Loan, Capital Markets, Emerging Market Structured Finance, High Yield Finance, Money Market Origination, Municipal Finance, and Structured Finance), J. Aron and in any other division or affiliate who are engaged in investment banking or other advisory activities; and all partners, employees and non-employee workers who "crossed the Wall". For purposes of the Chinese Wall, all personnel in GSAM are treated as being on the sales and trading side of the Firm.

5

The Chinese Wall, together with the Firm's Grey List and Restricted Trading List procedures, generally enables the sales and trading side of the Firm to continue to engage in transactions or make recommendations with respect to securities, even when the advisory side of the Firm possesses material confidential information relating to such security or its issuer.

### 3. Wall-Crossing Procedures

If you are on the advisory side of the Firm, you may not disclose confidential information to anyone on the sales and trading side of the Firm or give such person access to any file or database containing any such information, except in accordance with the Firm's Wall-crossing procedures set forth in Section III(D) of this Memorandum and in certain Bulletins. If you are on the sales and trading side of the Firm, you may not obtain or make any effort to obtain confidential information from anyone on the advisory side of the Firm except in accordance with the Firm's Wall-crossing procedures.

In general, the Firm's Wall-crossing procedures require partners and employees on the advisory side of the Firm to obtain prior approvals from appropriate supervisory persons before making any disclosure to a partner or employee on the sales and trading side of the Firm. Before any Wall-cross may occur, you must notify the Compliance Department Control Room (New York – 902-1511, London – 774-5717, Hong Kong – 2-978-0500, or Tokyo – 5563-7496).

### 4. Personal Trading

Many of our partners and employees invest in securities in order to achieve long-term personal financial goals. In order to comply with regulatory requirements, all partners and employees must open and maintain their "partner/employee accounts" and "related accounts" at the Firm. You may not maintain a securities, commodities or futures account at any broker, dealer, bank or investment adviser without the Firm's permission. Just as the Firm is committed to avoiding conflicts of interest or their appearance, you should avoid trading in your partner/employee or related accounts in a way that would create an actual or apparent conflict or disadvantage any client transaction. Thus, you must observe the trading limitations set forth in Section VIII(D) of this Memorandum and in any Bulletins applicable to your business unit.

### 5. Private Investments and Outside Business Activities

You must obtain prior written approval with respect to private investments or outside business activities. Examples of private investments and outside business activities are set forth in Sections IX and X of this Memorandum.

6

# II. Policies Regarding Confidential and Proprietary Information

It is the Firm's policy that no partner or employee may misuse *material confidential* or *proprietary information*. Definitions of these terms and others relevant to this discussion appear below.

**A. Definitions**

## 1. Confidential Information

▌ means nonpublic information provided by an external source (such as a client, prospective client or other third party) with the expectation that the information will be kept confidential and used solely for the business purposes for which it was conveyed by the external source. It also includes materials generated by the Firm that contain or are derived from such confidential information. While there are exceptions, information obtained in the course of a client assignment should generally be considered confidential. However, in certain circumstances confidential information would not include information obtained by the Firm acting as principal on an arm's length basis (absent a confidentiality letter, agreement or understanding to keep such information confidential). When in doubt, you should ask the Legal or Compliance Department whether information is to be treated as confidential.

▌ may be received from partners, officers or employees of, or lawyers, accountants or other professionals involved with, a client, prospective client or other third party.

▌ may include "tips" received directly or indirectly from corporate insiders whether or not in the context of a client relationship. Tips are especially likely to be considered confidential information when the recipient knows, or should know, that the corporate insider has disclosed the information improperly, in breach of the insider's duty to his or her own company.

▌ is "nonpublic" if it has not been effectively disseminated to the general public. Examples of public dissemination may include a press release carried over a major news service, an article in a major news publication, a public filing made with a regulatory agency, a mailing such as a proxy statement or prospectus sent to shareholders or potential investors, or otherwise made available through public disclosure services. It is important to note that even following a public announcement of a major corporate transaction, many aspects of the matter may remain nonpublic. When in doubt, you should ask the Legal or Compliance Department whether information is to be treated as "nonpublic".

▌ may include information relating to orders for futures if such orders have not yet been made public by being entered on the relevant exchange.

7

10/95

### 2. Proprietary Information

▪ means nonpublic information, analyses and plans that are created or obtained by the Firm for the Firm's business purposes, other than that which constitutes confidential information entrusted to the Firm or its personnel by an external source.

▪ may include any of the following: unpublished research information, opinions, estimates and recommendations; unpublished research analyses of companies or industries; information about the Firm's securities or futures trading positions or trading intentions; the Firm's investment, trading or financial strategies or decisions; pending or contemplated customer orders; data collection and client bases; advice to clients; and analyses done by the Firm of companies that are potential acquirers of other companies or their assets or companies that are possible candidates for acquisition, merger or sale of assets.

▪ is "nonpublic" until it has been effectively disseminated, such as by means of a research report or publication, materials communicated to potential investors or customers, or materials available from public disclosure services.

### 3. Material Information

▪ means information likely to be viewed by a reasonable investor as important in deciding whether to purchase, sell or hold a security. It can also mean information (including trading information) likely to have an effect on the value of the security.

▪ may include, but is not limited to, information about changes in dividends; financial forecasts or projections (especially estimates of future earnings or losses); changes in previously released earnings or earnings estimates; changes in dividend policy; changes in accounting procedures; writedowns of assets; additions to reserves for bad debts; expansion or curtailment of operations; increases or declines in orders; significant product developments; major litigation; liquidity problems; repurchase programs; program orders; changes in management; contests for corporate control; anticipated public offerings of securities; imminent block orders; short positions; to-be-announced changes of ratings of debt securities; proposed transactions such as refinancings, refundings, tender or exchange offers, recapitalizations, leveraged buy-outs, acquisitions, mergers, restructurings, or purchases or sales of assets; adoption of new accounting rules; as yet unreleased government reports and statistics, and certain unannounced government actions.

▪ may relate to uncertain or contingent events.

### 4. Securities

▪ include all forms of stock, limited partnership interests, notes, bonds, debentures and other evidences of indebtedness, investment contracts, warrants, and options. Securities may be issued by for-profit organizations, nonprofit organizations or governmental entities.

### 5. Futures

▪ include futures and options on futures traded on exchanges.

8

**B. Prohibition on the Misuse of Material Confidential or Proprietary Information**

### 1. Use of Material Confidential or Proprietary Information

Material confidential information obtained directly or indirectly from a client may be used only for the specific purpose or transaction for which it was given. Any other use without the permission of the client which originally entrusted the Firm with the information is a misuse.

Proprietary information may be used only for the business purposes for which the information was created or obtained; any other use without the express prior approval of the appropriate division head is a misuse.

Confidential or proprietary information may not be used by a partner or employee for that person's personal benefit or for the benefit of any related person.

No one may communicate confidential or proprietary information to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in the misuse of the information.

Where the Firm has issued a confidentiality letter, partners and employees must adhere strictly to its provisions.

### 2. Trading While in Possession of or With Knowledge of Material Confidential Information

No partner or employee may buy or sell a security of any issuer when in possession of or with knowledge of material confidential information relating to the issuer or the security. These restrictions apply whether the trade is for any proprietary account of the Firm or for any partner, employee or related account (as defined below in Section VIII).

No partner or employee may buy or sell any future (or the underlying security or index) while in possession of or with knowledge of material confidential information regarding customer transactions in the future, any related future, or the underlying security or index. An exception applies if the transaction is a *bona fide* hedging transaction or an "exchange of futures for physicals" or a similar type of transaction entered into in accordance with the Firm's policies and procedures set forth in this Memorandum or in applicable Bulletins.

### 3. Trading While in Possession of or With Knowledge of Material Proprietary Information

No partner or employee may buy or sell a security of any issuer for any account when in possession of or with knowledge of material proprietary information relating to the issuer or the security, unless the transaction is consistent with the Firm's business purposes for which the information was created or obtained.

9

### 4. Trading in Securities on the Restricted Trading List, Rumor and Deal List, and Research Restricted List

When a security is on the *Restricted Trading List*, no partner or employee may buy or sell that security for any account without prior approval from the Compliance Department or other designated authorized person. When a security is on the *Rumor and Deal List*, no partner or employee may buy that security for his or her partner, employee or related account. Unless an exception has been granted, purchases and sales of a security on the *Research Restricted List* are prohibited for any proprietary account (subject to certain exceptions such as market making and customer facilitation) and for any partner, employee or related account for the greater of 24 hours or one full business day following the release of the research.

### 5. Recommendations

No partner or employee may recommend, advise or suggest that a client or any other person buy, sell or hold (or solicit a customer or any other person to buy or sell) any security of any issuer or any future while that partner or employee is in possession of or has knowledge of confidential information concerning the issuer or security (or the future, any related future, or the underlying security or index) except in connection with the business purposes for which the information was received or obtained. This prohibition applies regardless of whether the partner or employee discloses the confidential information and regardless of whether the client or other person also possesses or has access to the information.

### 6. Treatment of Customer Orders

Unless an exception has been granted in accordance with this Memorandum and applicable Bulletins, no partner or employee may purchase or sell a security, commodity or future for a partner, employee or related account if he or she is aware that the Firm is effecting or proposing to effect a transaction for a client account in a security of the same issuer.

10

# III. Procedures for Handling Confidential and Proprietary Information

**A. Introduction (Chinese Wall Policies)**

The securities laws, rules of self-regulatory organizations, and Firm policy require specific procedures for handling confidential and proprietary information and for separating the disparate business activities of the Firm. These procedures which control the flow of confidential and proprietary information (the "Chinese Wall"), in combination with the Grey List and Restricted Trading List procedures, constitute the Firm's Chinese Wall procedures.

The Chinese Wall procedures are reasonably designed to help assure the confidentiality of information and to prevent those partners and employees engaged in the research, sales or trading of securities, including those engaged in GSAM activities (the "sales and trading side of the Firm"), from gaining access to confidential information that the Firm may have acquired or developed in connection with the investment banking or other advisory activities of other partners and employees of the Firm (the "advisory side of the Firm").

The Chinese Wall procedures generally enable (absent Firm-imposed restrictions) the sales and trading side of the Firm to continue to engage in transactions or make recommendations with respect to securities, even when the advisory side of the Firm possesses material confidential information relating to such security or its issuer.

**B. General Procedures for Safeguarding Confidential and Proprietary Information**

To safeguard the confidentiality of nonpublic information, the Firm uses the following procedures as are appropriate to particular Firm activities.

*General Confidentiality*
Partners and employees should maintain the confidentiality of information learned in the course of their employment.

*Disclosures*
Partners and employees should not disclose confidential or proprietary information except to other Firm personnel or persons outside the Firm (such as the Firm's outside counsel or a client's attorneys or accountants) who have a valid business reason for receiving such information—i.e. who have a "need to know" the information in order to serve the business purposes of the Firm or its clients. In addition, a partner or employee may not disclose confidential information obtained directly or indirectly from a client or proprietary information prepared on the basis of such confidential information to any person who does not have a "need to know" without the consent of the client from whom the information was obtained or for whom it was prepared. This policy does not prohibit disclosure of confidential information regarding a client to a lender, participant, transferee, assignee, purchaser or other person for the purpose of advancing the client's interests and with the client's explicit or implicit permission.

11

10/95

Except as permitted by, and subject to, the policies and procedures set forth in this Memorandum and in applicable Bulletins, confidential or proprietary information should not be disclosed to another partner, employee or any other person, even if there is reason to believe that the other person will keep the information in confidence. This means that:

■ anyone working on a confidential matter should, in general, avoid discussing the matter with partners or employees not assigned to the matter, except for supervisory personnel within the individual division or business unit, inside or outside legal counsel, or others having a need to know, unless such discussion is conducted in accordance with the Wall-crossing and other procedures described in this Memorandum and any applicable Bulletins; and

■ no one should seek to obtain confidential or proprietary information from any person unless he or she has a need to know the information in order to perform assigned tasks and unless he or she observes the Wall-crossing and other procedures for obtaining such information described in this Memorandum and in any applicable Bulletin.

*Discussions*
Partners and employees should avoid discussions of sensitive information relating to the Firm's or its clients' affairs with, or in the presence of, persons who have no need to know the information. They should use extreme caution when discussions take place in hallways, elevators, taxicabs, trains, subways, airplanes, airports, restaurants, social gatherings and other public places. They should avoid using speakerphones in circumstances in which confidential information may be overheard. Mobile telephones should be used with great care and circumspection because they are not secure.

*Access*
To the extent possible, partners and employees should limit access to office areas where confidential or proprietary information may be discussed, and only persons with a business reason for being in such an area should be permitted there. Where possible, work on confidential projects should take place in an area that is physically secure. In addition, meetings with non-Goldman Sachs personnel should, to the extent possible, be conducted in conference rooms rather than in partner or employee offices.

*Documents*
Partners and employees should avoid placing confidential documents in office areas, including photocopying machines, where they may be read by persons not authorized to read them. When not in use, confidential documents should be stored in locked file cabinets or other secure locations. Partners and employees should avoid leaving them exposed overnight on desks or in workrooms.

12

*Code Names*
Code names should be used for sensitive projects and solicitations. Where code names have been assigned to a project, all documents and information generated internally by the Firm with respect to that project should, as appropriate, refer to the relevant companies only by their code names.

*Databases*
Confidential databases and other confidential information accessible by computer should be maintained in computer files that are password-protected or otherwise secure against access by unauthorized persons.

*Press Inquiries*
Any person not specifically authorized to respond to press inquiries concerning a particular matter should refer all calls relating to the matter to Corporate Communications or the Legal Department.

*Physical Separation*
In order to restrict the flow of confidential information, the Firm, to the extent appropriate, physically separates business units engaged in sales and trading activity from business units which regularly receive confidential information in the normal course of their business activities. In addition, with respect to futures, the Firm, to the extent appropriate, physically separates customer brokers from proprietary traders. Physical separation may be maintained by procedures such as those limiting access to certain areas to persons with security cards or separating sales and trading desks.

*Deal Teams*
Members of a deal team must preserve the confidentiality of all confidential information they receive directly or indirectly from a client and all information created or assembled for the benefit of the client. In particular, no deal team member may provide any information concerning the transaction to someone not a member of the deal team unless disclosure is specifically authorized by the senior member of the deal team or unless such disclosure is in accordance with the procedures set forth in this Memorandum.

*Questions Concerning Confidential or Proprietary Information*
Anyone who believes that confidential or proprietary information may have been obtained or disclosed not in accordance with the policies and procedures set forth in this Memorandum or in applicable Bulletins should contact the Legal or Compliance Department immediately and should not use or further disclose the information unless and until otherwise notified by the Legal or Compliance Department.

**C. Restrictions on the Flow of Confidential Information**

*Persons on the advisory side of the Firm* include all personnel in the Investment Banking Division, the Credit Department, the Principal Investment Area, Real Estate PIA, and those persons or functions in the Equities and Fixed Income Divisions (e.g. Equities Capital Markets, Asset Backed Finance, Bank Loan Origination, Bridge Loan Origination, Bridge Loan, Capital Markets, Emerging Market Structured Finance, High Yield Finance, Money Market Origination, Municipal Finance, and Structured Finance), in J. Aron and in any other division or affiliated who engages in investment banking or other advisory activities; and all partners, employees and non-employee workers who have "crossed the Wall".

13

*Persons on the sales and trading side of the Firm* include all personnel in Investment Research; those persons in the Equities and Fixed Income Divisions and J. Aron who engage in research, trading (including arbitrage) or sales activities; and all other partners and employees engaged in research, trading, sales or other nonadvisory activities. For purposes of the Chinese Wall, all personnel in GSAM are treated as being on the sales and trading side of the Firm.

Except in accordance with the Firm's Wall-crossing procedures (set forth in Section D below):

- no person on the advisory side of the Firm should disclose confidential information to any person on the sales and trading side of the Firm, or give such person access to any file or database containing any such information.

- no person on the sales and trading side of the Firm should obtain or make any effort to obtain confidential information from any person on the advisory side of the Firm.

In the context of futures trading, conversations between customer brokers and proprietary traders are permitted only for the purpose of communicating market information which does not indicate particular customer orders or trading activity.

A partner or employee on the sales and trading side of the Firm who for any reason obtains information that person believes may be confidential other than in accordance with the Chinese Wall procedures set forth in this Memorandum and other appropriate Bulletins should immediately notify the supervisory person designated in the appropriate Bulletins, who in turn should consult the Legal or Compliance Department concerning what, if any, action should be taken. Unless advised to the contrary by the Legal or Compliance Department, such partner or employee should refrain from engaging in transactions in the related securities for any account and avoid further disclosure of the information.

A partner or employee on the advisory side of the Firm who learns facts that suggest that securities of a company should be placed on the Grey List or the Restricted Trading List should raise the question with the supervisory person designated in the appropriate Bulletins.

The placement of a security on the Restricted Trading List or Grey List does not terminate these Chinese Wall procedures concerning disclosure and confidentiality as to that security or its issuer.

14

## D. Wall-Crossing Procedures

If it becomes necessary for any partner or employee on the advisory side of the Firm to disclose confidential information to partners or employees on the sales and trading side of the Firm in the course of obtaining advice or other assistance, such disclosures may be made only in accordance with the applicable Bulletins which set forth specific procedures to be followed by personnel of the particular division or business unit. It is important to note that in some cases, the very fact that the partner or employee on the advisory side of the Firm is working on an assignment for a particular company may constitute material confidential information.

In general, the Firm's Wall-crossing procedures require advisory partners and employees to obtain prior approvals on a project-by-project and person-by-person basis from the appropriate supervisory person in their division or business unit, as designated in the appropriate Bulletin, before making any disclosures to a partner or employee on the sales and trading side of the Firm. Before such approval is granted, the Compliance Department must be notified of the identity of the research, trading or sales partner(s) or employee(s) who are proposed to be brought across the Wall. The Compliance Department will notify the designated supervisory person in the research, trading or sales business unit of the proposed Wall-crosser(s). If approval is obtained from the proposed Wall-crosser's designated supervisory person, the Compliance Department shall notify the appropriate advisory partner or employee that the proposed Wall-crosser(s) may be contacted. Any issues concerning Wall-crossing will be resolved by the supervisory person designated in the relevant Bulletins in conjunction with the Legal or Compliance Department. An appropriate record of all Wall-crossings will be maintained by the Compliance Department.

Disclosures to any sales and trading partner or employee who crosses the Wall should be limited to information that the sales and trading partner or employee *needs to know* in order to carry out work for the advisory partner or employee. Particular efforts should be made to avoid communication of information (such as long-term projections) that will not become public during the course of the transaction, because the possession of such information may restrict the activities of the sales and trading partner or employee even after the transaction is completed or terminated for an indefinite period of time. Conversations with any sales and trading partner or employee who crosses the Wall should be conducted in a manner designed not to be overheard by persons not authorized to receive confidential information.

A sales and trading partner or employee who has crossed the Wall will be treated as a partner or employee on the advisory side of the Firm for purposes of the Firm's policies and procedures for as long as he or she knows or possesses material confidential information. Accordingly, such partner or employee must maintain the confidentiality of such information and may use it only for the business purposes for which it was disclosed. The Legal or Compliance Department will ordinarily allow a Wall-crosser to resume normal sales and trading activities when it determines that he or she did not receive any material confidential information, or that any such information is no longer material or that such information has become public.

15

# IV. The Grey List

**A. Introduction**

The Grey List ("GL") is a confidential list of securities about whose issuers the Firm may have received material confidential information, usually concerning a transaction or other event for which the Firm has been engaged, or where the Firm has been retained to advise an issuer or otherwise has determined that there is a reason to monitor trading activities.

The GL is ordinarily used to identify potential conflicts, facilitate the monitoring of, without restricting, sales and trading and other activities in those securities in order to monitor compliance with the Chinese Wall procedures set forth in this Memorandum and the Bulletins. In appropriate circumstances, however, the Legal or Compliance Department may intervene to break trades, freeze or liquidate securities positions, require "passive" trading activity, halt the dissemination of research, or impose other restrictions on the activities of the Firm, its partners or employees in connection with securities on the GL.

The contents of the GL and any restrictions that result from them are confidential. No one may engage in discussions regarding the contents of the GL with persons inside the Firm except in accordance with the Firm's Chinese Wall procedures. No one may engage in a discussion with anyone outside the Firm concerning the contents of the GL.

Distribution of the GL is very limited. It is available only to persons specified by the General Counsel.

**B. Placement of Securities on and off the Grey List**

A security will ordinarily be placed on the GL when the Firm has received material confidential information concerning that security or its issuer in the course of the Firm's involvement in a possible transaction or other event that has not been publicly announced or when the Firm has been engaged to advise the company with respect to a market-sensitive transaction. Ordinarily, when the Firm signs a confidentiality letter or executes an engagement letter, any relevant security of the issuer will be placed on the GL.

Decisions to place a security on the GL involve questions of judgment and not merely the application of arbitrary or mechanical standards. For this reason, specific guidance for these decisions is provided in appropriate Bulletins.

It is the responsibility of personnel in the division or business unit whose activities call for the addition of a security to or its deletion from the GL to request the addition or deletion promptly. Subject to the requirement to consult with and obtain the agreement of the persons designated in the appro-

16

10/95

priate Bulletins, requests to add securities to or delete them from the GL may be made by any person.

It is essential that partners and employees engaged in advisory activities be alert to circumstances that might require a security to be placed on or deleted from the GL. When in doubt, a partner or senior team member involved in the transaction should be consulted.

A security ordinarily will be removed from the GL when the persons designated in the appropriate Bulletins determine that it is no longer necessary to monitor research, sales and trading activities with respect to the security or its issuer.

**C. Monitoring**

When a security has been placed on the GL, the Firm conducts a retroactive review of transactions, including transactions in partner and employee accounts, in the Firm's proprietary accounts and in customer accounts, that involve the security.

The Firm conducts a daily review of partner and employee transactions, the Firm's proprietary transactions and customer transactions involving securities on the GL.

When a security has been placed on the GL, the release of research with respect to the security will be reviewed prior to release by the Compliance Department.

17

# V. The Restricted Trading List

**A. Introduction**

To comply with securities laws, avoid the appearance of impropriety and supplement the Chinese Wall, the Firm maintains a Restricted Trading List ("RTL"). The RTL is a list of securities which are subject to restrictions in handling customer orders, trading for proprietary accounts and for partner, employee and related accounts, and other activities.

A security ordinarily will not be placed on the RTL until after a relevant transaction (and/or the Firm's involvement in the relevant transaction) has been publicly announced or has otherwise become a matter of public record.

**B. Use of the Restricted Trading List**

The RTL is solely for the internal use of the Firm. No one may engage in discussions regarding whether a security is or is not on the RTL with persons outside the Firm without specific clearance by a person designated in an appropriate Bulletin.

The RTL is distributed daily (electronically and/or in written form) to various partners and employees throughout the Firm.

**C. Prohibitions Relat-ing to Restricted Trading List Securities**

The placement of a security on the RTL generally restricts trading in the specified classes of the security unless an exception is granted by certain authorized persons. This means that, depending on the reason for placing a security on the RTL, absent an exception, the following activities in RTL securities may be prohibited: proprietary trading, market-making, transactions in customer accounts, transactions for discretionary accounts, the recommendation of transactions, and trading in partner, employee or certain related accounts. Once a security is placed on the RTL, the release of research with respect to the security will be reviewed prior to release by the Compliance Department to determine whether it may be released. Further discussion of prohibited or permitted activities relating to RTL securities is set forth in appropriate Bulletins.

RTL prohibitions generally apply to all securities which are convertible, exchangeable or exercisable into a security that is on the RTL.

**D. Placement of Secu-rities on and off the Restricted Trading List**

A security may be placed on the RTL for a number of reasons. Therefore, no inferences should be drawn concerning a company or its securities due to its Restricted Trading List inclusion on the RTL.

Reasons for restrictions include:

18



■ **Reinforcing the Chinese Wall.** When one or more business units of the Firm may be in possession of material confidential information, the Firm may restrict sales and trading in order to avoid the possible appearance of misusing that information.

■ **Complying with Rule 10b-6, 10b-7, 10b-8 or 10b-13.** When the Firm is participating in a distribution of securities or is involved as a Dealer/Manager or Bidder in connection with a tender offer, SEC rules impose certain restrictions on the Firm's activities with respect to certain classes of securities.

■ **Other purposes.** Trading, sales or research activities in the securities of a company may be restricted to meet other compliance, business or regulatory objectives, such as those imposed by Rule 144, Rule 144A, Rule 145 and shelf registration requirements.

Securities may be placed on the RTL at the direction of the individuals designated in the appropriate Bulletins. It is the responsibility of personnel in the division or business unit whose activities necessitate such a restriction at the appropriate time to add all appropriate securities to the RTL.

It is essential that partners and employees engaged in investment banking or other advisory activities be alert to circumstances that might require the placement of a security on or off the RTL. When in doubt, a senior deal team member or the persons designated in the appropriate Bulletins should be consulted.

Decisions to place a security on the RTL generally involve questions of judgment and not merely the application of arbitrary or mechanical standards. For this reason, specific guidance for these decisions is provided in appropriate Bulletins.

Generally, a security will be removed by the Compliance Department from the RTL at the request of the same person who requested it be added. The security can be removed from the RTL when the Firm's involvement in the transaction relating to the security has ended, when the transaction has been concluded or when it is otherwise determined that it is no longer necessary to restrict activities in the security.

**E. Exceptions to the Restricted Trading List**

The Compliance Department and supervisory persons designated in the Bulletins or the Supervision Manual may grant exceptions to RTL prohibitions in appropriate circumstances. Any request for such an exception may be granted only by the Compliance Department or a designated person, and the exception must be granted **before** any otherwise prohibited activity is effected.

**F. Monitoring**

When a security has been placed on the RTL, the Firm conducts a retroactive review of transactions, including transactions in partner and employee accounts, in the Firm's proprietary account(s) and in customer accounts, that involve the security.

The Firm conducts a daily review of partner and employee transactions, the Firm's proprietary transactions and customer transactions involving RTL securities.

19

# VI. Research Restricted List

The Research Restricted List (RRL) is a list of securities maintained by the Firm with respect to which the Firm is issuing significant new or significantly changed research opinions, such as when a security is added to or deleted from the Firm's Recommended for Purchase List. The RRL is solely for the internal use of the Firm. The RRL is to be maintained by the Compliance Department.

A security is placed on the RRL on the day when the Firm issues significant new or significantly changed research relating to such a security. When a security has been placed on the RRL, trading in the specified classes of the security is generally prohibited, unless an exception is granted by the Compliance Department. This means that, absent such an exception, the following activities in RRL securities are prohibited: proprietary trading (with certain exceptions, such as market-making or customer facilitation) and trading in partner, employee and certain related accounts for the greater of 24 hours or one full business day following the release of the research. The Firm conducts a review of partner and employee transactions as well as the Firm's proprietary transactions involving RRL securities.

20

# VII. Rumor and Deal List

The Rumor and Deal List is a confidential list of companies that are the subject of rumors and publicly announced deals, including companies in reorganization. It is prepared by the Firm and maintained by the Compliance Department.

"Deal" or "rumor" securities are stocks, options and fixed income securities of companies that are the subject of reports or rumors of actual or anticipated corporate transactions, bankruptcy or reorganization proceedings, or other corporate events. (This includes companies that are the subject of transactions in which the Firm is involved as well as those in which the Firm is not involved in an investment banking capacity, and it includes companies that are the subject of transactions for which there has been a formal announcement as well as transactions for which there has been no such announcement.)

Partner, employee, and related accounts generally are prohibited from purchasing securities of such companies.

Companies are added to or deleted from the Rumor and Deal List by the Compliance Department with the approval of the Rumor and Deal List Committee, as identified in the Supervision Manual.

# VIII. Partner, Employee and Related Accounts and Trading

**A. General Policies (purpose and scope)**

No partner or employee may maintain a securities, commodities or futures account at another broker, dealer, bank or investment adviser without the Firm's permission, except as specified on the **Securities/Commodities Account Information and Request Form.** No partner or employee may use an outside account manager in connection with transactions for partner, employee or related accounts whether or not the transactions are effected through an account maintained at the Firm.

Partners and employees may engage in securities, commodities and futures transactions only for **investment** purposes, **not** for short-term trading profits. This applies to investments of all kinds including, but not limited to, foreign and domestic equity and fixed income securities, options, commodities and futures. The holding of any position in a partner, employee or related account for less than 30 days (measured on a last-in first-out basis) would be inconsistent with this policy. Partners and employees **must** obtain **prior** approval from their division head or designee **and** the Director of Compliance before selling any security, commodity or future that was purchased, or purchasing any security, commodity or future that was sold, within the prior 30 days. Such approval ordinarily will be granted only (1) on the basis of unforeseen and compelling circumstances or (2) for so-called "tax-swap" transactions at year end.

Partners and employees must not take any action including, but not limited to, the purchase or sale of securities, commodities or futures for any partner, employee or related account which could cause even the appearance that an unfair or improper action has been taken. For example, all personnel must refrain from transactions that represent a potential conflict of interest with the Firm or any client or customer and must follow the guidelines set forth below and in applicable Bulletins.

**B. Definitions**

**1. Partner or Employee Account** includes the following securities, commodities and futures accounts:

∎ any personal account of a partner or employee;

∎ any other account over which the partner or employee has investment discretion or otherwise can exercise control, whether pursuant to a formal trading authorization or a fiduciary position such as trustee or otherwise; and

∎ any other account in which the partner or employee has a direct or indirect beneficial or financial interest.

22

**2. Related Account** includes the following securities, commodities and futures accounts:

- any account of a spouse or a minor child of the partner or employee;
- any account for children and their spouses if financially dependent on the partner or employee;
- any account of other relatives residing with the partner or employee; and
- any account designated by the General Counsel as a related account due to the degree of influence of the partner or employee.

**C. Monitoring Transactions**

The Firm's supervisory personnel review securities, commodities or futures transactions that are entered into by any partner or employee of the Firm. These transactions are reviewed by the partner, or his or her designee, responsible for reviewing the individual's transactions as specified in the Supervision Manual.

Transactions effected through the Firm are reviewed daily, and transactions effected through other broker-dealers are reviewed as they are reported to the Firm. The Compliance Department prepares various exception reports identifying transactions that may merit further review. These exception reports are reviewed primarily by designated supervisory personnel.

**D. Specific Trading Limitations**

Unless an exception has been granted pursuant to Section F below, a partner or employee may not purchase or sell a security, commodity or future for a partner, employee or related account if:

- the partner or employee is purchasing or selling the security, commodity or future on the basis of material confidential information or proprietary information;
- the transaction is prohibited by the Restricted Trading List;
- the partner or employee is aware that the Firm is effecting or proposing to effect a transaction for its proprietary account(s) or for a client account in a security of the same issuer;
- the partner or employee is aware that the Firm is working on a transaction on behalf of the issuer of the security or that the Firm is working on a transaction that may affect securities of the issuer; the partner or employee is making the sale or purchase on the basis of the Firm's or its analysts' public (or to-become-public) recommendation(s) and the Firm's customers have not yet had an opportunity to act on such recommendation(s). The period during which these accounts must refrain from trading in order to give customers an opportunity to act may depend on the specific circumstances, but normally the restriction will extend until the greater of 24 hours or one full business day following the release of the recommendation.
- the partner or employee does not identify an order for a personal or related account or for a personal or related account of any other partner or employee as such at the time it is entered;
- the transaction involves the purchase of securities of companies that are the subject of rumors or publicly announced deals, including companies in reorganization, whether or not the Firm is involved in the rumored or announced transaction; or

23

▌ the transaction involves the sale of "naked" options, or unhedged short sales of securities or commodities (fully hedged options and short sales are permitted, including stock options and short sales hedged with in-the-money convertible bonds). However, the sale of out-of-the money index call options, and the sale of properly margined equity put options is permitted. Outright short positions in futures may not be maintained; short futures positions may be held if they are part of a "spread" position composed of the short position and a corresponding future position.

A partner or employee may not purchase a security, commodity or future for a partner, employee or related account if the partner or employee has sold a position in such security, commodity or future within the past 30 days, and a partner or employee may not sell a security, commodity or future that the partner or employee has held for less than 30 days (measured on a last-in first-out basis), unless the partner or employee has the **prior** approval from his or her division head or designee **and** the Director of Compliance. However, subject to case-by-case consent of the individual's department manager, partners/employees will be allowed to reduce or liquidate positions notwithstanding the 30-day rule, insofar as the position, or any portion of that position, was created by a transaction within the 30-day period and the unrealized loss arising from such transaction(s) exceeds 20% of the equity invested in the transaction(s).

**E. Specific Division or Business Unit Limitations**

Additional guidelines applicable to specific divisions or business units are set forth in detail in the appropriate Bulletins and may exempt from any applicable transaction pre-approval requirements. Investments in (i) U.S. Treasury securities (including options and futures) and government securities of other G7 countries, (ii) unsecured debt of U.S. Government sponsored enterprises (GSEs) not linked to any other securities (including options and futures), (iii) options on broad-based market indices (e.g. S+P 400), (iv) open-end mutual funds, or (v) investment grade municipal securities may not be subject to applicable transaction pre-approval requirements.

**F. Exceptions**

Exceptions to the policy requiring partner, employee and "related" accounts to be maintained at the Firm will be granted only under unusual and compelling circumstances. Additionally, approval may be given with respect to an account of a parent or grandparent sharing residence with a partner or employee provided the partner or employee is not involved in the investment decisions and has no financial interest in such accounts. Any partner or employee requesting such approval must submit a written request to the Compliance Department. Where permission has been granted to maintain an account outside the Firm, the partner or employee is responsible for ensuring that arrangements are in place to provide the Compliance Department with contemporaneous, duplicate copies of all confirmations and statements for the account. The partner or employee may be asked periodically to justify in writing the continuation of the account.

Exceptions to any of the other foregoing policies should be requested only in the most unusual and compelling circumstances and may be granted only with the consent of **both** the designated partner in the applicable division and the Director of Compliance.

24

# IX. Private Investments

Each partner and employee **must** obtain **prior** written Firm approval with respect to private investments. Prior to making such an investment, a **Private Investment Information and Request Form** must be submitted to the Compliance Department, which will coordinate the process of seeking the required approvals. In addition if a partner or employee is aware of a private investment opportunity that may be of interest to the Firm or any of the funds it manages as a principal investment, the *Principal Investment* Area should also be contacted whether or not the partner or employee is interested in making a personal investment. In situations in which the Firm or any managed fund makes a principal investment, partners and employees may not co-invest (except through the Stone Street and Bridge Street Funds).

Examples of investments requiring prior written Firm approval include, but are not limited to:

- transactions in securities, options, commodities or futures that are not publicly offered or traded or that are not available through the Firm, its subsidiaries and affiliates;

- participation in hedge funds, leveraged buy-out transactions, real estate offerings, private placements, and oil and gas partnerships or working interests not available through the Firm, its subsidiaries and affiliates;

- acceptance of offers of options or shares by personnel who serve on boards of directors;

- transactions involving real estate or agricultural land held for investment purposes, jointly in partnership with another person (other than family members);

- investing in any other business, whether or not related to securities (e.g., fast-food franchises, restaurants, sports teams, etc.); and

- owning stock or having, directly or indirectly, any financial interest in any other organization engaged in any securities, commodities, futures or related business; provided, however, that approval is not required with regard to stock ownership or other financial interest in any securities, commodities or futures, financial or related business which is publicly owned, unless a control relationship exists.

Note: Investments obtained through the Firm, e.g., Stone Street Fund, etc., **are not** subject to this approval procedure.

25

# X. Outside Business Activities

Each partner and employee **must** obtain **prior** written Firm approval with respect to outside business activities. Prior to engaging in such activities, a partner or employee must submit the **Outside Business Activities Information and Request Form** to the Director of Compliance, who will coordinate the process of seeking the required approvals. Such approval, if granted, may be given subject to restrictions or qualifications and is revocable at any time.

Examples of activities requiring prior written Firm approval include full- or part-time service as an officer, director, partner, consultant or employee of another business organization (including acting as a director of a company whose securities are publicly traded); agreements to provide financial advice (e.g. through service on a **finance or investment committee**) to a private, educational or charitable organization; and any agreement to be employed or accept compensation in any form (e.g., commission, salary, fee, bonus, contingent compensation, etc.) by a person or entity other than the Firm (or its subsidiaries and affiliates). Approval is generally not given for requests to serve as an officer, director, partner, consultant or employee of another business organization.

26

# EXHIBIT  C

NAME _____
(PLEASE PRINT)

## CONFIDENTIALITY OF FIRM INFORMATION

In the course of your everyday work, you will often become aware of information of a confidential nature pertaining to the business of the Firm and its clients. The importance of preserving the confidentiality of such information and of using it only for the purpose for which it was obtained cannot be overemphasized.

It is impossible to describe in general terms what type of information should be regarded as confidential. Material contained in the Credit Files should always be so regarded, as well as information relating to any matters that have not been publicly announced. Even following a public announcement, however, many aspects of a matter may remain confidential. The safe policy is not to discuss the Firm's or its clients' affairs with, or in the presence of persons who have no "need to know." This includes discussions in elevators, taxicabs, restaurants, and public places generally. This also means that anyone working on a confidential matter should, in general avoid discussing the matter with partners or employees outside their department, except for inside or outside legal counsel or others having a "need to know".

To insure the protection of its reputation, the Firm will take strong action against any person making improper use of confidential information or contributing to a breach of confidentiality. Each partner and employee has the right to expect from every other partner and employee his or her complete cooperation in this area.

I have read and agree to the foregoing.

_____
SIGNATURE

1-13-86
_____
DATE

*Debra Marczuk*

**Goldman Sachs**

1

*Chicago 5-24-89*

## *Confidentiality of Firm Information*

In the course of your everyday work, you will often become aware of information of a confidential nature pertaining to the business of the Firm and its clients. The importance of preserving the confidentiality of such information and of using it only for the purpose for which it was obtained cannot be overemphasized.

It is impossible to describe in general terms what type of information should be regarded as confidential. Material contained in the Credit Files should always be so regarded, as well as information relating to any matters that have not been publicly announced. Even following a public announcement, however, many aspects of a matter may remain confidential. The safe policy is not to discuss the Firm's or its clients' affairs with, or in the presence of persons who have no need to know. This includes discussions in elevators, taxicabs, restaurants, and public places generally. This also means that anyone working on a confidential matter should, in general avoid discussing the matter with partners or employees outside their department, except for inside or outside legal counsel or others having a need to know.

To insure the protection of its reputation, the Firm will take strong action against any person making improper use of confidential information or contributing to a breach of confidentiality. Each partner and employee has the right to expect from every other partner and employee his or her complete cooperation in this area.

I have read and agree to the foregoing.

*Debra L. Marczyk*
SIGNATURE

*Debra L. Marczyk*
NAME (PLEASE PRINT)

*5-24-89*
DATE

12/24/91

## EMPLOYEE AGREEMENT REGARDING CONFIDENTIAL AND
## PROPRIETARY INFORMATION AND MATERIALS

In connection with your employment by Goldman, Sachs & Co., or any of its subsidiaries or affiliates (collectively called "Goldman Sachs"), you may have access to non-public information and materials, including but not limited to materials describing or relating to the business and financial affairs, personnel matters, operating procedures, organizational responsibilities, marketing matters, and policies or procedures of Goldman Sachs or its partners, employees, clients or other third parties; or the personal affairs of partners or employees ("Confidential and Proprietary Information and Materials"). With respect to such Confidential and Proprietary Information and Materials, you agree as follows:

1. Confidential and Proprietary Information and Materials shall be used only as authorized and only for the purposes intended by Goldman Sachs.

2. You will hold all Confidential and Proprietary Information and Materials in strict confidence and, except for the above authorized uses, will not, nor will you permit any agent to, give, disclose, copy, reproduce, sell, assign, license, market or transfer Confidential and Proprietary Information and Materials to any person, firm or corporation, including any partner or employee of Goldman Sachs who does not have a need to know or see the Confidential and Proprietary Information and Materials. This provision applies to unauthorized writings of any kind containing such information or materials, including books and articles.

3. Upon the termination of your employment (or earlier if requested by Goldman Sachs), you will return to Goldman Sachs all originals and copies of documents and other materials relating to Goldman Sachs or containing or derived from Confidential and Proprietary Information and Materials which are in your possession, accompanied, if requested, by a certificate signed by you and satisfactory to Goldman Sachs to the effect that all such Confidential and Proprietary Information and Materials have been returned.

4. You agree to refrain from publicizing, disclosing, or allowing disclosure of any information about Goldman Sachs, its partners, employees, clients or other third parties, and their business and financial affairs, personnel matters, operating procedures, organization responsibilities, marketing matters and policies or procedures, in such a way that a reasonable person would expect such information to be disseminated to the general public, without prior written authorization from Goldman Sachs. This prohibition applies to unauthorized writings of any kind, including books and articles.

5. While employed by Goldman Sachs, you will not disclose or use without authorization any information concerning persons or entities other than Goldman Sachs which is confidential or proprietary to them, nor will you use information in any manner which would constitute a violation of any undertaking or agreement with a prior employer or other third party. Except as noted below or as otherwise disclosed to Goldman Sachs in writing, you represent and warrant that you are not subject to any understanding, undertaking or agreement which would preclude your employment with Goldman Sachs or which would limit your ability to undertake particular assignments on behalf of Goldman Sachs.

Exceptions:

CONF/GSCO

6. You affirm that you have all necessary rights, authorizations and licenses to provide the services contemplated by this Agreement and to provide all related materials and that the provision of such services and materials or any component thereof, and Goldman Sachs' use of concepts, materials or information provided by the undersigned will not constitute a breach of any agreement to which the undersigned is a party, or constitute an infringement of any patent or copyright, or constitute an authorized use of proprietary information or trade secrets of a third party.

7. You hereby irrevocably assign to Goldman Sachs, its successors and assigns, and Goldman Sachs shall have, exclusive ownership rights, including, without limitation, all patent, copyright and trade secret rights, with respect to any work, including, but not limited to, any invention, discoveries, concepts, ideas or information, conceived by you in the course of your employment with Goldman Sachs, and all documents, data and other information of any kind including, incorporating, based upon or derived from the foregoing, including reports and notes prepared by you. Such work will be the property of Goldman Sachs, shall be considered a work made for hire and may not be used for any purposes other than the benefit of Goldman Sachs. Any and all such property and material containing such property shall be delivered to Goldman Sachs on request and in any event at the termination of the your employment by Goldman Sachs, and no copies thereof shall be retained by you unless the prior written consent of Goldman Sachs is obtained with respect thereto. You will cooperate fully with Goldman Sachs to establish, protect or confirm Goldman Sachs' exclusive rights in such work or to enable it to transfer legal title together with any patents that may be issued. A certificate evidencing compliance with this provision shall, if requested, be provided to Goldman Sachs.

The obligations created by this Agreement shall survive the termination of your employment. You acknowledge that any violation, breach or other failure on your part to comply with this Agreement could materially and irreparably injure Goldman Sachs and its business in a manner inadequately compensable in damages, and that Goldman Sachs may seek and obtain injunctive relief against the breach or threatened breach of this Agreement in addition to any other legal remedies which may be available.

_____
Signature

_____
Print Name

_____
Date

6/17/94

# EMPLOYEE AGREEMENT REGARDING CONFIDENTIAL AND PROPRIETARY INFORMATION AND MATERIALS

*In connection with your candidacy for employment or any future employment by Goldman, Sachs & Co. or any of its subsidiaries or affiliates (collectively called "Goldman Sachs"), you may have access to non-public information and materials, including but not limited to information and materials describing or relating to the business and financial affairs, personnel matters, operating procedures, organizational responsibilities, marketing matters, and policies or procedures of Goldman Sachs or its partners, employees, clients or other third parties; or the personal affairs of partners or employees ("Confidential and Proprietary Information and Materials"). With respect to such Confidential and Proprietary Information and Materials, you agree as follows:*

1. Confidential and Proprietary Information and Materials shall be used only as authorized and only for the purposes intended by Goldman Sachs.

2. You will hold all Confidential and Proprietary Information and Materials in strict confidence and, except for the above authorized uses, will not, nor will you permit any agent to give, disclose, copy, reproduce, sell, assign, license, market or transfer Confidential and Proprietary Information and Materials to any person, firm or corporation, including any partner or employee of Goldman Sachs who does not have a need to know or see the Confidential and Proprietary Information and Materials. This provision applies to unauthorized writings of any kind containing such information or materials, including books and articles.

3. Should you become an employee, upon the termination of your employment (or earlier if requested by Goldman Sachs), you will return to Goldman Sachs all originals and copies of documents and other materials relating to Goldman Sachs or containing or derived from Confidential and Proprietary Information and Materials that are in your possession or control, accompanied, if requested, by a certificate signed by you and satisfactory to Goldman Sachs to the effect that all such Confidential and Proprietary Information and Materials have been returned.

4. Unless you have prior written authorization from Goldman Sachs, you will not publicize, disclose or allow disclosure of any information about Goldman Sachs, its present or former partners, directors, officers, employees, agents or clients, its or their business and financial affairs, personnel matters, operating procedures, organization responsibilities, marketing matters and policies or procedures, or any aspects of your candidacy for employment or your tenure as an employee of Goldman Sachs or of the termination of such employment, with any reporter, author, producer or similar person or entity, or take any other action seeking to publicize or disclose any such information in any way likely to result in such information being made available to the general public in any form, including books, articles or writings of any other kind, as well as film, videotape, audiotape or any other medium.

5. While employed by Goldman Sachs, you will not disclose or use without authorization any information concerning persons or entities other than Goldman Sachs that is confidential or proprietary to them, nor will you use information in any manner that would constitute a violation of any undertaking or agreement with a prior employer or other third party. Except as noted below or as otherwise disclosed to Goldman Sachs in writing, you represent and warrant that you are not subject to any understanding, undertaking or agreement that would preclude your employment with Goldman Sachs or that would limit your ability to undertake particular assignments on behalf of Goldman Sachs.

Exceptions:

6. You affirm that you have all necessary rights, authorizations and licenses to provide the services contemplated by this Agreement and to provide all related materials and that the provision of such services and materials or any component thereof, and Goldman Sachs' use of concepts, materials or information provided by the undersigned, will not constitute a breach of any agreement to which the undersigned is a party, or constitute an infringement of any patent or copyright, or constitute an unauthorized use of proprietary information or trade secrets of a third party.

7. You hereby irrevocably assign to Goldman Sachs, its successors and assigns, and Goldman Sachs shall have exclusive ownership rights, including, without limitation, all patent, copyright and trade secret rights, with respect to any work, including, but not limited to, any invention, discoveries, concepts, ideas or information, conceived by you in the course of your employment with Goldman Sachs, and all documents, data and other information of any kind including, incorporating, based upon or derived from the foregoing, including reports and notes prepared by you. Such work will be the property of Goldman Sachs, shall be considered a work made for hire and may not be used for any purposes other than the benefit of Goldman Sachs. Any and all such property and material containing such property shall be delivered to Goldman Sachs on request and in any event at the termination of your employment by Goldman Sachs, and no copies thereof shall be retained by you unless the prior written consent of Goldman Sachs is obtained with respect thereto. You will cooperate fully with Goldman Sachs to establish, protect or confirm Goldman Sachs' exclusive rights in such work or to enable it to transfer legal title together with any patents that may be issued. A certificate evidencing compliance with this provision shall, if requested, be provided to Goldman Sachs.

*The obligations created by this Agreement shall survive the termination of your candidacy for employment and/or your employment. You acknowledge that any violation, breach or other failure on your part to comply with this Agreement could materially and irreparably injure Goldman Sachs and its business in a manner inadequately compensable in damages, and that Goldman Sachs may seek and obtain injunctive relief against the breach or threatened breach of this Agreement in addition to any other legal remedies that may be available.*

_____
SIGNATURE

ATUL PHULL
_____
PRINT NAME

MAY 8, 1998
_____
DATE

# EXHIBIT  D

**From:** Rohde (Marczyk), Debra L
**Sent:** Tuesday, September 19, 2000 11:38 AM
**To:** 'crohde@ameritech.net'
**Subject:** trade ticket.xls



trade ticket.xls

Account Breakdown

Date/Time:

:7

BUY

SELL

SHORT SALE

Number of Shares

Price

SYMBOL:

| Customer Name: | Synonym | Account # | Margin | Quantity Received | Price | Commission |
|---|---|---|---|---|---|---|

REDACTED

| | |
|---|---|
| **From:** | Rohde (Marczyk), Debra L |
| **Sent:** | Tuesday, September 19, 2000 11:37 AM |
| **To:** | 'crohde@ameritech.net' |
| **Subject:** | topaccount.xls |



topaccount.xls

REDACTED

REDACTED

REDACTED

Account Name

Account Number

Account Class

TR Date

Trustee

Account Name

Account Number

Account Class

TR Date

Trustee

REDACTED

REDACTED

**From:** Rohde (Marczyk), Debra L
**Sent:** Tuesday, September 19, 2000 11:37 AM
**To:** 'crohde@ameritech.net'
**Subject:** Al's ticket.xls



Al's ticket.xls

Account Breakdown
Strikas/Beaty #220

Date/Time:

BUY

SELL

SYMBOL: AMOUNT:

| Customer Name: | Synonym | Account # | DE/DNE | Allocation | Quantity Received | Price | Commission |
|---|---|---|---|---|---|---|---|

REDACTED

| From: | Rohde (Marczyk), Debra L |
|---|---|
| Sent: | Friday, September 08, 2000 3:28 PM |
| To: | 'crohde@ameritech.net' |
| Subject: | topaccount.xls |



topaccount.xls

REDACTED

*ATTACHED FILE NOT COPIED*
*FOR THIS EXHIBIT*

# EXHIBIT   E

| From: | Strikas, Algis |
|---|---|
| Sent: | Friday, September 15, 2000 12:06 PM |
| To: | 'algiss1024@aol.com' |
| Subject: | various |

Untitled

Untitled

Untitled

Untitled

RE: 10% CHICAGO_TEAM_220_Nov9..

RE: 10% CHICAGO_TEAM_220_Nov9..

Fw: A couple of good pics

Arthur Frigo 25aug00

Canada - rep 220.xls

Canadian accounts.xls

Canadian Customers - Opening A...

Canadian Wealth Management Dis...

clarification on non-discretio...

Dance Like No one's Watching...

FW: Dial in #s: BackWeb (BWEB...

Document5

Equity Derivatives PCS Marketi...

Four Quarters Special Investme...

Frigo's Acct Summary

Gun Control Anyone?

FW: If I knew......

jerry niehus called for al- 63...

Labels

Re: Lithuanian Scout Associati...

FW: Men and Women

FW: New Gross Credit Schedule....

New T-List Rules

Oooopppssss!!

Overview of Changes to PCS Com...

FW: Pretty sad state of affair...

shortflow.ppt

**REDACTED**

*ATTACHED FILES NOT COPIED*
*FOR THIS EXHIBIT*

1

**From:** Strikas, Algis
**Sent:** Wednesday, September 20, 2000 10:22 AM
**To:** 'algiss1024@aol.com'
**Subject:** FW:                    :00

-----Original Message-----
**From:** Ploder, Steven
**Sent:** Monday, August 28, 2000 11:01 AM
**To:** Strikas, Algis
**Subject:**

 

'.xls                    -0.xls

REDACTED

1

REDACTED

A
as of 8/25/2000

Symbols | Trade Date | Settle Date | Date Sold | Buy/Sell/Sell | Purch. Price | # of Orig. | Date of Settl | Split Type | # After Split | # of Current | Commission | Net Purch Amt | Book Value | Net Real Gains | Mkt Price | MKt Value | Unreal G/L



A
as of 8/25/2000

| Symbols | Trade Date | Settle Date | Date Sold | Bou/Sold/Sett | Purch. Price | # of Cntr | Date of Sell | Sell Type | Adj. Buy Split | # of Current | Commission | Net Purch. Amt | Book Value | Net Real Gain | Mkt. Price | Mkt. Value | Unreal. G/L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



| | |
|---|---|
| **From:** | Strikas, Algis |
| **Sent:** | Wednesday, September 20, 2000 10:22 AM |
| **To:** | 'algiss1024@aol.com' |
| **Subject:** | FW: Canada - rep 220.xls |

-----Original Message-----

| | |
|---|---|
| **From:** | Broder, Adam |
| **Sent:** | Monday, September 20, 1999 9:15 PM |
| **To:** | Beaty, Jeffrey; Strikas, Algis |
| **Subject:** | Canada - rep 220.xls |

Canada - rep 220.xls        Canada - top 100.doc

Attached is a list of Canadian accounts that we have matched to your rep number. Please confirm that no Canadian accounts are missing from the spreadsheet. The asset and gross credit information is current as of June 30, 1999.

Also attached is a list of the 100 richest people in Canada. Please confirm whether any of these individuals or families are clients.

Thank you for your assistance.

**REDACTED**

*NOT ALL ATTACHED FILES COPIED*
*FOR THIS EXHIBIT*

1

REDACTED

PCS Canadian Accounts

| Acct. Number | Acct. Name | Rep Number | Assets | Gross Credits | Listed | Nasdaq | Fixed Income | Convertibles | Derivatives | Euro Shares | Asian Shares | L. America Shares | UK Shares | Japanese Shares | Canadian Shares | Emerging Markets | Special Inst. | Misc. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | |
|---|---|
| **From:** | Strikas, Algis |
| **Sent:** | Wednesday, September 20, 2000 10:21 AM |
| **To:** | 'algiss1024@aol.com' |
| **Subject:** | FW: Canadian Wealth Management Discussion Materials |

—–Original Message—–

| | |
|---|---|
| **From:** | Lamotte, Gardner |
| **Sent:** | Tuesday, May 09, 2000 10:02 AM |
| **To:** | Waxman, Jordan H; Mooney, Michael H; Beaty, Jeffrey; Whitlock, David; Ryan, Thomas; Ascher, Rachel; Strikas, Algis |
| **Subject:** | Canadian Wealth Management Discussion Materials |

There will be discussion materials provided at today's meeting, but for those who will be calling in, the attached are the materials that will be provided.

| May9th_Agenda.doc | Exhibits.doc | PCS_AccountOpening_Memo.doc | PCS_New_Issue_Distribution_Mem... | Regulations_opening_seperate_a... | Mutual_Fund_Investing_For_Cana... |
|---|---|---|---|---|---|

| Canadian_Single_Stock_Risk_Man... | Canadian_Undergraduate_Recruit... |
|---|---|

**REDACTED**

*NOT ALL ATTACHED FILES COPIED*
*FOR THIS EXHIBIT*



# Canada Wealth Management

One New York Plaza, 49th Floor
Room 49B
Tuesday, March 9, 2000

### Agenda

1) Update on Status of Canadian Wealth Management Conference

2) Legal, Compliance and Provincial Registration Update

4) Mutual Fund Investing in GSAM Products

5) Single Stock Risk Management for Canadian Investors

5) Overview of Proposed Undergraduate Recruiting at Canadian School(s)

6) Regional Wealth Management Updates

REDACTED

*SAMPLE OF ATTACHED FILE*

DRAFT: August 12, 1999

[GS&Co. Memo Format]

**Privileged & Confidential**

TO:  PCS Securities Sales Personnel
    *Goldman, Sachs & Co.*

DATE:  August 16, 1999

RE:  **Opening Accounts and Trading with Canadian PCS Customers**

**REDACTED**

***SAMPLE OF ATTACHED FILE***
***(COVER PAGE ONLY)***

**DRAFT: September 6, 1999**

[Letterhead of GS&Co.]

M E M O R A N D U M

<u>**Privileged & Confidential**</u>

TO:         PCS Securities Sales Personnel
                *Goldman, Sachs & Co.*

FROM:      Anthony J. Leitner
                Michael Crowl
                Rachel Ascher
                Howard Lipper
                *Legal Department*

DATE:      September ●, 1999

RE:         **Distribution of New Issues to Canadian PCS Customers**

---

# REDACTED

*SAMPLE OF ATTACHED FILE*
*(COVER PAGE ONLY)*

| | |
|---|---|
| **From:** | Strikas, Algis |
| **Sent:** | Wednesday, September 20, 2000 10:20 AM |
| **To:** | 'algiss1024@aol.com' |
| **Subject:** | FW: Special Investments 31jul00 |

-----Original Message-----
| | |
|---|---|
| **From:** | Ploder, Steven |
| **Sent:** | Friday, August 25, 2000 9:02 AM |
| **To:** | Strikas, Algis |
| **Subject:** | Special Investments 31jul00 |

Al-

For your files.....

-Steve

| | | |
|---|---|---|
| special investments - | a 7-31-00.xls | special investments- |

**REDACTED**

*ATTACHED FILES NOT COPIED*
*FOR THIS EXHIBIT*

JS 44
(Rev. 12/96)

*Cat 1*

00C 5889

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

GOLDMAN, SACHS & CO.

## DEFENDANTS

ALGIS STRIKAS, JEFFREY BEATY, DEBRA ROHDE and ATUL PHULL

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE NOLAN

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  **New York**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   **Cook**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Eric D. Brandfonbrener
GRIPPO & ELDEN
227 W. Monroe Street, #3600
Chicago, IL 60606   312.704.7700

ATTORNEYS (IF KNOWN)

DOCKETED
SEP 2 6 2000

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | / ☐ 385 Property Damage Product Liability | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / ☐ 510 Motion to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | | ☐ 871 IRS — Third Party 26 USC 7609 | ☒ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights / ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | | |
| ☐ 290 All Other Real Property | / ☐ 540 Mandamus & Other | | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Diversity jurisdiction *28 U.S.C. Sect. 1332) action pursuant to Illinois Trade Secret Act (765 ILCS 1065) for misappropriation of trade secrets and breach of fiduciary duties.

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ N/A

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

## VIII. This case

☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE  **9/25/00**

SIGNATURE OF ATTORNEY OF RECORD

Eric D. Brandfonbrener, Attorney for Plaintiff Goldman, Sachs & Co.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

In the Matter of

Goldman, Sachs & Co.,
                Plaintiff,
        v.

Algis Strikas, Jeffrey Beaty,
Debra Rohde and Atul Phull,
                Defendants.

**00C  5889**

Case Number:

JUDGE JOAN H. LEFKOW

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

PLAINTIFF Goldman, Sachs & Co.

MAGISTRATE JUDGE NOLAN

| (A) | (B) |
|---|---|
| SIGNATURE *Gary M. Elden* | SIGNATURE |
| **DOCKETED** SEP 2 6 2000 | |
| NAME Gary M. Elden | NAME Eric D. Brandfonbrener |
| FIRM GRIPPO & ELDEN | FIRM Same as A. |
| STREET ADDRESS 227 West Monroe Street, #3600 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL  60606 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 312.704.7700 / FAX NUMBER 312.558.1195 | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS gelden@grippoelden.com | E-MAIL ADDRESS edbrandfonbrener@grippoelden.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 00728322 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06195674 |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☒ |
| TRIAL ATTORNEY? YES ☐ NO ☒ | TRIAL ATTORNEY? YES ☒ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER / FAX NUMBER | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |